# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39004**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Jordin B. LAFONTAINE**
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 2 August 2017

————————————

*Military Judge:* Donald R. Eller, Jr. (arraignment); Joshua E. Kastenberg (trial).

*Approved sentence:* Bad-conduct discharge, confinement for 42 months, total forfeiture of pay and allowances, reduction to E-1, and a reprimand. Sentence adjudged 9 October 2015 by GCM convened at Moody Air Force Base, Georgia.

*For Appellant:* Major Lauren A. Shure, USAF; Captain Patricia Encarnación Miranda, USAF; James S. Trieschmann, Jr., Esquire.

*For Appellee:* Major G. Matt Osborn, USAF; Major Mary Ellen Payne, USAF; Gerald R. Bruce, Esquire.

Before MAYBERRY, HARDING, and BROWN, *Appellate Military Judges.*

Judge BROWN delivered the opinion of the court, in which Senior Judge MAYBERRY and Senior Judge HARDING joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

BROWN, Judge:

A general court-martial composed of a military judge sitting alone convicted Appellant, consistent with her pleas, of three specifications of conspiracy; one specification of false official statement; six specifications of wrongful use and distribution of multiple controlled substances; six specifications of conduct of a nature to bring discredit upon the armed services, including two specifications of child endangerment, one specification of obstruction of justice, one specification of destruction of evidence, and two specifications of communicating a threat; and one specification of bank fraud under 18 U.S.C. § 1334 in violation of Articles 81, 107, 112a, and 134 Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 881, 907, 912a, 934. Pursuant to a pretrial agreement (PTA), the military judge, on the Government's motion, dismissed with prejudice a number of charges and specifications,[1] and the convening authority approved the sentence as adjudged.[2]

On appeal, Appellant asserts: (1) the military judge abused his discretion when he accepted Appellant's guilty plea to two specifications of child endangerment and one specification of communicating a threat in violation of Article 134, UCMJ, 10 U.S.C. § 934; and (2) the Government's violation of the 120-day standard for convening authority's action warrants modest sentence relief pursuant to *United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002). Finding no error that materially prejudices a substantial right of Appellant, we affirm the findings and sentence.

## I. BACKGROUND

Appellant used a variety of controlled substances including cocaine, lysergic acid diethylamide, and marijuana over the course of several months with some fellow Airmen. She also conspired to distribute cocaine and methamphetamine and conspired to commit bank fraud, facilitating the depositing of $10,000.00 worth of bad checks and subsequent withdrawal of $10,000.00

---

[1] These included one charge and its specification of willful and wrongful damage to property in violation of Article 109, UCMJ, 10 U.S.C. § 909; two specifications of wrongful possession of a controlled substance with intent to distribute in violation of Article 112a, UCMJ, 10 U.S.C. § 912a; one charge and its specification of assault consummated by battery of a child under the age of 16 years in violation of Article 128, UCMJ, 10 U.S.C. § 928; and one specification of wrongful solicitation of another to commit an offense in violation of Article 134, UCMJ, 10 U.S.C. § 934.

[2] Appellant was credited with a total of 295 days of pretrial confinement credit: 98 days for illegal pretrial confinement and 197 days for pretrial confinement.

from her bank account. Appellant then told her former supervisor her bank account had been robbed and as a result, obtained grants in the amount of $600 from the Air Force Aid Society. After learning she was under investigation, Appellant instructed a civilian involved in her drug ring to delete all of the text messages concerning their illegal activity and to "factory reset" her phone to destroy any electronic evidence on it. Appellant then "factory reset" her own cellular phone to destroy evidence she believed the Air Force Office of Special Investigations (AFOSI) was about to seize. After being interviewed by AFOSI agents, Appellant believed A1C NG had "rolled over" on her and her fellow drug users. She threatened to call her friends to teach A1C NG a lesson and also to make him a sex offender by reporting that A1C NG had sexually assaulted her. Finally, Appellant endangered the health and welfare of her infant son, MH, by exposing him to unsafe living conditions at their residence and also by leaving him outside in 50 degree temperatures and rain over the course of seven consecutive hours when he was six weeks old.

## II. DISCUSSION

### A. Providency of Appellant's Pleas

Appellant asserts the military judge abused his discretion when he accepted her guilty pleas to two specifications of child endangerment because the guilty plea inquiry failed to establish that her conduct constituted culpable negligence or endangered her son. Similarly, she avers her guilty plea to a specification of wrongfully communicating a threat was improvident as her admissions failed to establish that her statements were intended as a threat.

A military judge's decision to accept a guilty plea is reviewed for an abuse of discretion. *United States v. Blouin*, 74 M.J. 247, 251 (C.A.A.F. 2015). "The test for an abuse of discretion in accepting a guilty plea is whether the record shows a substantial basis in law or fact for questioning the plea." *United States v. Moon*, 73 M.J. 382, 386 (C.A.A.F. 2014) (citing *United States v. Passut*, 73 M.J. 27, 29 (C.A.A.F. 2014)). The military judge must question the accused under oath about the offenses to ensure there is an adequate factual basis for a guilty plea. Rule for Courts-Martial (R.C.M.) 910(e); *see* Article 45(a), UCMJ, 10 U.S.C. § 845(a). "It is an abuse of discretion for a military judge to accept a guilty plea without an adequate factual basis . . . ." *United States v. Weeks*, 71 M.J. 44, 46 (C.A.A.F. 2012). However, we look to the entire record to determine whether there is a substantial basis to question the guilty plea. *United States v. Jordan,* 57 M.J. 236, 238 (C.A.A.F. 2002).

"A plea is provident so long as Appellant was convinced of, and was able to describe, all of the facts necessary to establish his guilt." *United States v. Murphy*, 74 M.J. 302, 308 (C.A.A.F. 2015) (citation ommitted). "If an accused sets up matter inconsistent with the plea at any time during the proceeding,

the military judge must either resolve the apparent inconsistency or reject the plea." *Moon*, 73 M.J. at 386 (quoting *United States v. Hines*, 73 M.J. 119, 124 (C.A.A.F. 2014)). We "must find a substantial conflict between the plea and the accused's statements or other evidence in order to set aside a guilty plea. The mere possibility of a conflict is not sufficient." *Id.* (citation ommited).

### 1. Appellant's Pleas to Child Endangerment

Appellant was charged with two specifications of child endangerment in violation of Article 134, UCMJ, 10 U.S.C. § 934. As charged, the elements of the first specification are: (1) that Appellant had a duty for the care of MH; (2) that MH was then under the age of 16 years; (3) that Appellant endangered MH, his physical health, safety, and welfare by exposing him to a living environment laden with animal excrement, soiled diapers, and food waste; and (4) Appellant's conduct under the circumstances was of a nature to bring discredit upon the Armed Forces. *Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 68a(b).

The second specification of child endangerment has identical elements to the first, except the Government alleged Appellant endangered MH's physical health, safety, and welfare by leaving him strapped in an infant seat outside, exposed to rain. For both specifications, the military judge provided Appellant the following definitions during the *Care*[3] inquiry: The term "endanger" means to subject one to reasonable probability of harm. The term "duty of care" is determined by the totality of the circumstances and it may be established by statute, regulation, or legal parent-child relationship. The term "culpable negligence" is a degree of carelessness greater than simple negligence; it is a negligent act or omission accompanied by a culpable disregard for the foreseeable consequences to others of that act or omission. In the context of this offense, the term culpable negligence may include acts, when viewed in the light of human experience, which could foreseeably result in harm for a child, even though such harm would not necessarily be the natural and probable consequences of such acts or omissions. *See MCM*, pt. IV, ¶ 68a(c). Appellant stated she understood both the elements and definitions the military judge provided her and indicated she did not have any questions about them.

---

[3] *United States v. Care,* 40 C.M.R. 247 (C.M.A. 1969).

In the first specification, Appellant takes issue with the third element of the offense, stating her responses to the military judge's questions failed to establish she actually placed her son in a situation where there was a "reasonable probability of harm" or that her actions amounted to "culpable negligence." Appellant believes her admissions indicated a possibility of harm that could come to her son as a result of the unclean conditions of her home, but there was no evidence admitted, and her statements did not offer, sufficient proof of a reasonable probability that her son's mental or physical health, safety, or welfare were endangered. Appellant notes our superior court has held that "a criminal conviction for child endangerment requires more than a showing of irresponsible behavior coupled with speculation by the prosecution about what *possibly* could have happened to a child as a consequence of an accused's conduct." *United States v. Plant*, 74 M.J. 297, 300 (C.A.A.F. 2015) (emphasis in original). The court made clear that a charge of child endangerment "requires proof that the accused's conduct, either through design or culpable negligence, resulted in a reasonable *probability* that the child would be harmed." *Id.* (emphasis in original).

During the *Care* inquiry, the military judge conducted a full inquiry into Appellant's understanding of the elements of child endangerment and had Appellant describe in her own words all facts necessary to meet each element of the offense, ascertaining Appellant was personally convinced of her own guilt. Appellant stated that there were times when animal excrement, soiled diapers and food waste were left in places MH could access. She relayed that her own negligence caused the house she resided in with her son to be in a condition where "MH might come into contact with unhealthy material," though Appellant never saw MH "come into contact with anything that seemed disgusting or a direct threat to his health." She admitted she did not have visual contact with him all of the time and it was possible MH did come into contact with items that could be "dangerous" to him. She agreed that soiled diapers, food waste, and animal excrement were on the floor for a long enough period of time that MH could have come in contact with them. She further admitted that she had both a dog and a cat and did not remove their excrement in a reasonable amount of time on some occasions. She also stated she left ripped-open trash bags with food waste in them and soiled diapers on the floor where MH could access them and that MH was able to crawl across the floor during the charged time frame. Appellant stated there was nothing preventing her from meeting a minimum threshold of a duty of care for MH.

The stipulation of fact, which Appellant agreed could be used in determining the providence of her plea, is also instructive as to the conditions Appellant exposed MH to at their residence. In it, Appellant agrees:

> During the charged timeframe, [Appellant's] home was at times maintained in a noticeably unsanitary state. The floors on which [MH] would crawl were extremely dirty and there were piles of animal feces and animal urine throughout the accused's home. In addition, [Appellant's] home was observed on multiple occasions with trash from ripped open trash bags, dirty diapers, and spoiled food scattered throughout the house. During the charged timeframe [Appellant] left [MH], on more than one occasion, sitting in soiled, soggy diapers for hours at a time. [Appellant] agrees and admits that the conditions to which she exposed [MH] were unsanitary and posed a danger to his physical health, safety, and welfare.

Based upon Appellant's admissions in both the *Care* inquiry and stipulation of fact, we are convinced Appellant's conduct through her own culpable negligence exposed her son to animal feces and urine, open trash bags, dirty diapers, and that Appellant left her infant son in soiled diapers for hours at a time. We are also convinced that Appellant's conduct in exposing MH to these hazards resulted in a "reasonable probability" that MH would be harmed. *Id.* at 300.

Turning to the second specification, Appellant admitted during the *Care* inquiry, that she and MH were at a party at a friend's house on a rainy night in November. Appellant was drinking and socializing outside with her friend while MH slept in his car seat nearby from around 2300 until 0500 the next day. MH was dressed in a "onesie," pants and a shirt and was covered by a light blanket. The temperature was around 50 degrees and though MH was under a carport at times, due to the wind, he was rained on for brief periods of time during the night. At the time, MH was six weeks old. Appellant admitted that keeping MH out in the damp, cold temperatures endangered his physical health, safety and welfare and that MH could have gotten sick as a result of being exposed to the cold and rain which she described as between a mist and light rain. Appellant agreed that MH was exposed to the elements from before midnight until after five the next morning, and that the child was outside for a total of seven hours over the course of the night.

In the stipulation of fact, Appellant agreed that she left MH "strapped to an infant seat outside, exposed to the rain" and that her actions amounted to culpable negligence, endangering the physical health, safety and welfare of MH. Though Appellant likens her case to the appellant in *Plant*, we are not persuaded. In *Plant*, the court found there was "no reasonable probability of harm" to the appellant's 13-month-old son who was asleep in a crib in the appellant's own residence, and did not awaken during a party that lasted five hours, from 2000 to 0100 the next morning. *Id.* at 300. In this case, Appel-

lant's six-week-old baby was outside, exposed to 50 degree temperatures and periodic rain for close to seven consecutive hours. We find Appellant's culpable negligence in exposing MH to these conditions caused a "reasonable probability of harm" to MH's physical health, safety, and welfare and supports a conviction for child endangerment.

For both specifications, we find the military judge did not abuse his discretion when he accepted Appellant's pleas as they met all of the elements of child endangerment in violation of Article 134, UCMJ, 10 U.S.C. § 934, and Appellant's pleas are, therefore, provident.

### 2. Appellant's Plea to Communicating a Threat

The elements for this offense are as follows: (1) That Appellant communicated certain language expressing a present determination or intent to wrongfully injure the person, property, or reputation of another person, presently or in the future; (2) That the communication was made known to that person or to a third person; (3) That the communication was wrongful; and (4) That, under the circumstances, the conduct of the accused was of a nature to bring discredit upon the armed forces. *See MCM*, pt. IV, ¶ 110.b; *United States v. Rapert*, 75 M.J. 164, 166–67 (C.A.A.F. 2016).

In *Rapert*, our superior court reaffirmed its "long embraced . . . objective approach in determining whether a communication constitutes a 'threat' under the first element of Article 134, UCMJ." *Id.* at 168. The court stated that "when analyzing whether a communication constituted a threat under this first element, we have held that the existence of a threat should be evaluated from the point of view of a reasonable person." *Id.* (citations and quotations omitted).

The court, however, held that "this objective approach to the notion of a 'threat' refers only to the *first* element of the offense and not to the *third* element," stating, "[t]he third element of this offense, which requires that a threat be 'wrongful,' is properly understood to reference the accused's subjective intent." *Id.* at 169. Noting that "the proper legal framework for analyzing whether an individual communicated a threat as proscribed by Article 134, UCMJ, consists of both an objective prong and a subjective prong," the court restated, "for clarity's sake," the first and third elements of this offense using the following bracketed elements:

> (1) That the accused communicated certain language [that a reasonable person would understand as] expressing a present determination or intent to wrongfully injure the person, property, or reputation of another person, presently or in the future; . . . (3) That the communication was wrongful [in that the speaker intended the statements as something other than a

> joke or idle banter, or intended the statements to serve some-
> thing other than an innocent or legitimate purpose] . . . .

*Id.* (bracketed language in original).

Appellant asserts her statements under oath during her guilty plea were insufficient to establish a factual basis for a finding of guilty with respect to the third element of the offense, claiming for the first time on appeal, that the evidence does not show she actually intended her words to be understood as a threat.

Appellant stipulated that she stated to MM, "I'm going to call my friends to come teach [N] a lesson." During the *Care* inquiry, Appellant appears to try to minimize or qualify the language of the statement, telling the military judge:

> during a conversation with [MM], I made a statement regard-
> ing the possibility that if [her friends] found out, they might
> physically harm A1C [NG]. I do not remember the precise
> words that I used. . . . . I can see how the language I used
> might have implied that I would or have been reasonably per-
> ceived that way by [MM].

When the military judge pointed out that the stipulation of fact stated Appellant told MM, "I'm going to call my friends to come teach [N] a lesson," Appellant again qualified her statement relaying that although her statement would have frightened [A1C NG] and she was extremely upset with him, the statement was "more along the lines of 'I sure hope they don't find out because if they did find out, they could come and cause harm to [A1C NG].'" Appellant then clarified that her statement was "implying that some physical harm could come to him, but that I intended to make that happen," and when the military judge asked Appellant if she "intended to make it happen," Appellant responded "yes, sir." Appellant then admitted she was not joking when she made the statement and that she made the statement "out of anger."

After the initial inquiry was complete, trial counsel asked the military judge to clarify the statement made by Appellant to ensure the language expressed a threat. Trial defense counsel replied: "I think the statement, as it's recalled by Airman Lafontaine, is an implication that she's going to call [her friends] to come teach him a lesson. It's implied the way that she remembers it, the way that [MM] remembers is that she came out and said, 'I'm going to call,' and I think that those are close enough, or words to that effect, that covers that difference in their memories. I don't think Airman Lafontaine is sitting here claiming that she didn't say that, she's just — she's being honest

that she remembers it a different way but understands, in the context, why [MM] remembers it the way she does."

Appellant then agreed that MM would testify that Appellant made the statement as it was written in the stipulation of fact, and the military judge told Appellant:

> You may have remembered that you made a different . . . artic-ulated different words and that's fine, but what I'm now getting at is the intent of the words that you articulated, it's not the . . . the law doesn't require that you make a face-to-face threat to Airman First Class [NG], but the law does require that you did communicate words which were of a threatening nature to commit either immediate or in the future some harm to Airman [NG]. The threat may not necessarily be physical . . . . What I'm getting at is you made a statement to [MM], was the state-ment you made of a threatening nature so that either immedi-ately or in the future there was some possibility of harm either physical or mental or reputational that could have been com-mitted against Airman [NG], that you have the intent, rather, in making that statement of that becoming a possibility?

Appellant responded, "yes, sir." The military judge went on to ask Appel-lant:

> And someone can state under the law, "I hope or you better hope that so-and-so never finds out about this," and the intent is that that's conveyed to the party or that it's said to the party and the party would be put in fear. Is that what you are testify-ing to?

Appellant responded, "Yes, sir, that's exactly it." Appellant then stated she hoped her statement would put NG in fear. When trial counsel indicated more inquiry was needed, defense counsel stated, "Words can imply a threat. Airman Lafontaine has explained you [sic] how the words that she recalls us-ing imply a threat. The Charge . . . words to that effect in the Charge, I think, covers the discrepancy here. I'm not sure that further inquiry is going to get us anywhere."

The military judge then again clarified with Appellant that MM would testify Appellant made the statement as it was agreed upon in the stipulation of fact, Appellant was upset with A1C NG when she made the statement, the statement was not made in jest, MM could have told A1C NG about the statement, if A1C NG heard the statement it would have scared him, and it was Appellant's intent to put A1C NG in fear when she made the statement.

Based upon entire record, including the military judge's extensive inquiry with Appellant, Appellant's admissions during the *Care* inquiry, and the stipulation of fact, we find Appellant's plea met all of the elements of communicating a threat. *See Jordan*, 57 M.J. at 238–239 ("We are similarly mindful that a decision to plead guilty may include a conscious choice by an accused to limit the nature of the information that would otherwise be disclosed in an adversarial contest . . . . When this Court has addressed a bare bones providence inquiry, we have not ended our analysis at the edge of the providence inquiry but, rather, looked to the *entire* record to determine whether the dictates of Article 45, RCM 910, and *Care* and its progeny have been met.") (emphasis added).

It is uncontested that Appellant made a statement to MM as to her "friends" potentially harming A1C NG and despite Appellant's attempts to qualify the statement, a reasonable person would understand it to express a present intent to wrongfully injure A1C NG either presently or in the future. Similarly, Appellant's threat was wrongful. Though Appellant purported not to remember her exact words, she agreed her statement "implied" physical harm would come to A1C NG and that she intended to "make it happen." While the words used by Appellant are clearly important, so are the surrounding circumstances in determining Appellant's intent in making the statement. *See United States v. Brown*, 65 M.J. 227, 231–32 (C.A.A.F. 2007) (holding that divorcing words from the surroundings in which they were communicated and from their impact on the intended subject is illogical and unnatural; legal analysis of a threat must take into account both the words used and the surrounding circumstances).

Here, Appellant was admittedly angry at A1C NG because she believed he had "rolled over" by informing law enforcement about Appellant's and her friends' extensive drug use. Appellant admitted several times she was not joking when she made the statement. Appellant also explained why her conduct was service discrediting. Though she now asserts her statements at trial were insufficient to establish her subjective intent to communicate a threat and that she was "simply venting" when she spoke to MM, the record shows no less than seven occasions where she admitted under oath that her intent was in fact to threaten harm to A1C NG. We find her plea to this specification provident and no abuse of discretion by the military judge for accepting it.

## B. Post-Trial Processing

There is a presumption of unreasonable post-trial delay when a convening authority fails to take action within 120 days of trial. *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). Appellant asserts that because the con-

vening authority exceeded this standard by 12 days, we should grant her modest sentence relief. We disagree.

There are two steps to our analysis of whether Appellant is entitled to relief. First, we determine whether the delay in this case amounts to a denial of Appellant's due process right to speedy post-trial review and appeal. *Id.* at 135. Next, even if we find no due process violation, we also consider whether this court should exercise its power under Article 66(c), UCMJ, 10 U.S.C. § 866(c), to grant relief for excessive post-trial delay. *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002).

We consider four factors in determining whether post-trial delay amounts to a violation of due process rights: (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his [or her] right to a timely review; and (4) prejudice to the appellant. *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005), *United States v. Toohey*, 60 M.J. 100, 102 (C.A.A.F. 2004)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker v. Wingo*, 407 U.S. 514, 533 (1972)). However, when an appellant has not shown prejudice from the delay, there is no due process viola-tion unless the delay is so egregious as to "adversely affect the public's percep-tion of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

As noted above, the lapse of time between sentence and convening authority's action exceeded the *Moreno* standard by 12 days, establishing a facially unreasonable delay for this portion of the post-trial process. Therefore, the next question we consider is whether Appellant has been prejudiced by the delay. *Toohey*, 63 M.J. at 362. Appellant states she "became extremely depressed, saw a marked increase in her anxiety, suffered panic attacks, had inappropriate emotional reactions, and gained approximately 20 pounds" while awaiting the convening authority's decision on her clemency. The Government's explanation for the delay in obtaining action includes the court reporter's overall workload, the complexity of the record, the need to resend letters to the victims in the case, and a 10-day extension granted to Appellant for her counsel to submit clemency matters. Balancing the remaining factors, though we do not find the Government's explanation for the delay in violation of the *Moreno* standard compelling, we note Appellant did not assert her right to timely review, and we are convinced the delay was not so egregious as to undermine the appearance of fairness and integrity within the military justice system. Therefore, we find no due process violation.

Next, we consider whether Article 66(c), UCMJ, relief pursuant to *Tardif* is appropriate. 57 M.J. at 224. We are guided by factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J.

264 (C.A.A.F. 2016), with no single factor being dispositive.[4] Again, we note the Government's explanation for the delay, though clearly not intentional, is not overly compelling. Nevertheless, considering the remaining *Gay* factors, we conclude no extraordinary exercise of our Article 66(c), UCMJ, authority is warranted. We discern no particular harm to Appellant from the delay. The delay has also not lessened the disciplinary effect of Appellant's sentence. Finally, the delay has not adversely affected this court's ability to review Appellant's case or grant her relief, if warranted. Taken as a whole, the circumstances do not move us to reduce an otherwise appropriate sentence.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the find-ings and the sentence are **AFFIRMED**.

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court

---

[4] These factors include: (1) How long the delay exceeded the standards set forth in *Moreno*; (2) What reasons, if any, the Government set forth for the delay, and whether there is any evidence of bad faith or gross indifference to the overall post-trial processing of this case; (3) Keeping in mind that our goal under *Tardif* is not to analyze for prejudice, whether there is nonetheless some evidence of harm (either to the appel-lant or institutionally) caused by the delay; (4) Whether the delay has lessened the disciplinary effect of any particular aspect of the sentence, and is relief consistent with the dual goals of justice and good order and discipline; (5) Whether there is any evi-dence of institutional neglect concerning timely post-trial processing, either across the service or at a particular installation; and (6) Given the passage of time, whether this court can provide meaningful relief in this particular situation.